William Taliaferro THOMPSON, III, et al.

v.

Douglas B. FUGATE et al.

Civ. A. No. 316–71–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 14, 1972.

E. Milton Farley, III, T. S. Ellis, III, Hunton, Williams, Gay & Gibson, Richmond, Va., for plaintiffs.

Vann F. Lefcoe, Asst. Atty. Gen. of Virginia, Raymond Carpenter, Asst. U. S. Atty., Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This case represents yet another clash between the ecology and the construction of modern urban highway systems. The plaintiffs, owners of Tuckahoe Plantation, a large tract of land containing more than five hundred acres of much historical significance, seek to enjoin the Commissioner of the Virginia Highway Commission and the Secretary of Transportation (hereinafter "Commissioner" and "Secretary") from proceeding with a project to construct the final segment of a circumferential urban highway des-

ignated as Route 288 through a portion of their property. Specifically at issue in this proceeding is the location of the final 8.3-mile segment of this highway, part of a 75-mile circumferential beltway around the City of Richmond, Virginia.

Jurisdiction is attained pursuant to Title 5 U.S.C. §§ 701–706; 28 U.S.C. §§ 1331(a), 1332, 1361, and 2201–02.

Pursuant to the mandate of the United States Court of Appeals for the Fourth Circuit, an injunction entered by this Court after an evidentiary hearing was extended to prohibit the condemnation of the subject property pending trial and decision of the case on the merits.[1]

The matter is now before the Court on cross motions for summary judgment, filed by plaintiffs and the defendant Volpe. Defendant Fugate has filed a motion to dismiss. The Court has considered all filings by the respective parties, including attachments to counsel for Fugate's letter of February 7, 1972. The parties have exhaustively and thoroughly briefed the issues herein, and the case is now ready for disposition on the respective motions.

## A. THE PARTIES

Plaintiff Jessie Baker Thompson, daughter of Isabelle Ball Baker (deceased), is the owner of an undivided one-half of the remainder interest in Tuckahoe Plantation. Plaintiffs William Taliaferro Thompson, III, Addison Baker Thompson, and Jessie Ball Thompson are, respectively, sons and daughter of Jessie Baker Thompson, each of whom owns an undivided one-sixth of the remainder interest in Tuckahoe.

Defendant Douglas B. Fugate is Commissioner of the Virginia Highway Commission and in that capacity is responsible for planning, designing and constructing highways, including federal-aid highways, within the Commonwealth of Virginia.

Defendant John A. Volpe is the Secretary of the Department of Transportation and is charged with responsibility for the administration of the various federal-aid highway programs.

## B. TUCKAHOE

Tuckahoe Plantation is located in Goochland and Henrico Counties along the James River approximately twenty miles from the center of Richmond, Virginia, and within this judicial district. It was the home of the mother of Thomas Jefferson, third president of the United States, who lived there during an early period of his life. The property is also intimately associated with other prominent figures of early American history, including Chief Justice John Marshall and Thomas Mann Randolph, Governor of Virginia. The dwelling house dates from about 1712 and is believed to be the oldest wooden house remaining in Virginia. The house is a unique example of the H-shaped form of architecture, containing exceptional carved staircases and paneling. Both the exterior and interior of the house are well-preserved. In addition to the main dwelling house, there are also original plantation buildings, including a schoolhouse, kitchen, smokehouse, and other dependencies. The complex of buildings is located in a setting of great trees and extensive gardens. The historic value of Tuckahoe is beyond question and undisputed.

Pursuant to the Historic Sites Act of 1935, the Secretary of the Interior has designated the property as a Registered National Historic Landmark, being one of a limited number of historic sites found by the Secretary to "possess exceptional value as commemorating or illustrating the history of the United States." 16 U.S.C. § 462(b).

As such, Tuckahoe is included in the National Register of Historic Places, 36 Fed.Reg. 1337 (February 20, 1971), under the provisions of the National Historic Preservation Act of 1966 (16 U.S. C. § 470a).

1. Thompson et al. v. Fugate et al., 4 Cir., 452 F.2d 57 (1971).

## C. THE IMMUNITY QUESTION

█ The Commissioner has moved to be dismissed as a party defendant on the grounds of sovereign immunity under the eleventh amendment to the Constitution. That contention must fail, for this is not a suit against the State of Virginia, but one against its Commissioner of the Department of Highways to compel him and others to comply with the requisite federal laws in the building of the highway involved in this case. See also Ely v. Velde, 321 F.Supp. 1088 (E. D.Va.1971); Citizens Committee for Hudson Valley v. Volpe, D.C., 302 F. Supp. 1083, 425 F.2d 97 (2 Cir. 1970). See Arlington Coalition on Transportation v. Volpe, D.C., 332 F.Supp. 1218, 1222, rev'd on other grounds, 458 F.2d 1323 (4 Cir. 1972).

## D. BACKGROUND

The Richmond metropolitan beltway began as Interstate 295 in plans originated in 1955 for the Interstate Highway System. Approximately two-thirds of the beltway is designated I–295 and will be constructed with ninety per cent federal funds. The remaining third, Virginia Route 288, was planned in the late 1960's. Route 288 will be a median-strip, multi-lane, limited access, high speed highway built to federal interstate highway standards. It will form the southwestern portion of the beltway between I–64 and I–95.

The evidence discloses that in 1968 an unsuccessful application was made by the Virginia authorities to the Federal Highway Administration to include proposed Route 288 as part of the interstate system. This effort failed by reason of a lack of availability of additional interstate mileage allocations because of Congressional limitations on the interstate system.

In March, 1970, federal approval was granted as to the location of a 12.9-mile segment of Route 288.

On January 20, 1971, federal approval was granted for a second segment of 5.0 miles, a segment described in the letter of approval as "only a segment of the total project considered at the hearing and is all the Department requested our approval of at this time."

The facts further disclose that prior to the request for location approval of the segments aforementioned the Virginia Deputy Commissioner of Highways had by letter of February 6, 1970, requested of the federal authorities that the proposed Route 288 be added to the federal-aid primary system. An approval subsequently was in fact granted for the entire 29.2 miles of Route 288 which will connect with I–295 to make up the entire Richmond metropolitan beltway.

The significance of being an addition to the federal-aid system was described as being approved for further use of federal funds. "It says it is a legitimate intrical [integral] part of a total system of highways."

The approval granted for the 29.2 miles of Route 288 to be part of the federal-aid system was made on March 26, 1970. In January, 1971, federal location approval was granted Virginia for the middle segment of Route 288, that being 8.3 miles and the particular segment which is a focal point of this litigation. Location approval involves corridors up to one mile in width within which the actual specific right of way will ultimately pass.

While the appropriate Virginia authorities have not yet requested federal approval of it, the location of certain portions of Route 288 are planned to pass through the eastern portion of Tuckahoe. It is conceded that although corridor approval for the two segments of Route 288 to which the Court has already alluded have been requested and received, the formality of seeking federal aid has not been taken.

We deal here with a highway project which must be viewed in proper perspective. The Richmond beltway, including Route 288 in its entirety, is indeed one which must be characterized as a major federal action and a proposed federally-assisted undertaking. To characterize

the Tuckahoe segment as an isolated portion of Route 288, which might well result in a subversion of the announced Congressional policy with reference to our national environment, is to ignore the facts and the reasonable inferences to be drawn therefrom.

■ The beltway system must be viewed as a whole, and at the very least, Route 288 must be so viewed. Defendants suggest the Court do otherwise in the face of admitted significant federal participation in approximately 67 miles of a 75-mile circumferential highway.

■ The highway project with which we are concerned cannot be fractionalized. We do not deal here with an isolated street, local in nature, such as Sharon Lane in Civic Improvement Committee, et al. v. Volpe, et al., 459 F.2d 957 (4 Cir. 1972), but with a major federal-state project. See Named Individual Members of The San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013 (5 Cir. 1971); Citizens Committee for Hudson Valley v. Volpe, *supra*; D. C. Federation of Civic Associations v. Volpe, 316 F.Supp. 754 (D.D.C.1970); New York City v. United States, 337 F.Supp. 150; Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4 Cir. 1972). Any conclusion to the contra would be to participate in the frustration of Congressional policy,[2] a function which the courts are duty bound to avoid where possible. The meeting of federal requirements for 21 miles of a 29.2-mile highway project in order to partake of the federal financial allotments for that 21-mile segment, and at the same time circumvent the need to protect the national environment to the fullest extent possible on the remaining 8.3-mile segment by labeling it as a separate project, is to engage in a bureaucratic exercise which, if it is to succeed, must do so without the imprimatur of this Court—a task which is doomed to failure unless and until a superior court deems otherwise.

■ Any suggestion to the effect that it is too late to enforce valid enactments of Congress is rejected. Recent decisions have held that the National Environmental Policy Act applies to unexecuted portions of a plan or project. See Nolop v. Volpe, 333 F.Supp. 1364 (D.S.D.1971); Environmental Defense Fund v. Corps of Engineers, 324 F.Supp. 878 (D.D.C.1971); Lathan v. Volpe, 455 F.2d 1111 (9 Cir. 1971).

The Circuit by which this Court is bound has held in *Arlington Coalition, supra,* 458 F.2d at 1331, as follows:

"Doubtless Congress did not intend that all projects ongoing at the effective date of the Act be subject to the requirements of Section 102. At some stage of progress, the costs of altering or abandoning the project could so definitely outweigh whatever benefits that might accrue therefrom that it might no longer be 'possible' to change the project in accordance with Section 102. At some stage, federal action may be so 'complete' that applying the Act could be considered a 'retroactive' application not intended by the Congress. The congressional command that the Act be complied with 'to the fullest extent possible' means, we believe, that an ongoing project was intended to be subject to Section 102 until it has reached that stage of completion, and that doubt about whether the critical stage has been reached must be resolved in favor of applicability.

" 'We must stress as forcibly as possible that this language does not provide an escape hatch for foot-dragging agencies; it does not make NEPA's procedural requirements somehow "discretionary." Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration "to the fullest extent possible" sets a high standard for the

---

2. 42 U.S.C.A. § 4332 (NEPA).

agencies, a standard which must be rigorously enforced by the reviewing courts.'

"Calvert Cliffs' Coordinating Committee, supra, 449 F.2d at 1114. See also Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971); Morningside-Lenox Park Association, supra; Environmental Defense Fund, Inc. v. Corps of Engineers," supra.

The instant project has not reached that stage of completion at which the costs of altering or abandoning the proposed location would outweigh whatever benefits might be derived therefrom. See Fayetteville Area Chamber of Commerce and Interstate 95 Committee v. Volpe, et al., 463 F.2d 402 (4th Cir. 1972) decided July 24, 1972.

Having so concluded, it becomes necessary to determine what federal statutes are applicable.

Applicable Statutes:

1. The National Historic Preservation Act of 1966 (16 U.S.C. § 470f), which provides as follows:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any . . . effect of the undertaking on any district, site, building, structure, or object that is included in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

Pursuant to this section, the Advisory Council on Historic Preservation has established a procedure for compliance (36 Fed.Reg. 3312, February 20, 1971). This procedure provides:

At the earliest stage of planning or consideration of any undertakings carried out, licensed, or financially assisted by the Federal government, an agency should follow these steps:

1. Consult the National Register of Historic Places to determine if a National Register property is involved in the undertaking.

2. Apply the "Criteria for Effect." If there is no effect, the undertaking may proceed.

3. If there is an effect, regional, or state officials of the agency in consultation with the state liaison officer and a representative of the Office of Archeology and Historic Preservation shall:

> (a) determine if the effect is adverse—if not, the undertaking may proceed;

> (b) upon finding an adverse effect, select and agree upon a prudent and feasible alternative to remove the adverse effect, in which case the undertaking may proceed;

> (c) failing to find and agree upon an alternative, recommend all possible planning to minimize the adverse effect and delay further processing of the undertaking pending the receipt of comments from the Advisory Council.

4. Provide written notice affording the Advisory Council an opportunity to comment upon doubtful or unresolved situations of adverse effect and upon request submit a report of the undertaking . . .

### Criteria for Effect

A federally financed or licensed undertaking shall be considered to have an effect on a National Register listing (districts, sites, buildings, structures, and objects, including their settings) when any condition of the undertaking creates a change in the quality of the historical, architectural, archeological, or cultural character that qualified the property under the National

Register Criteria for Listing in the National Register.

Generally, adverse effect occurs under conditions which include but are not limited to:

(a) destruction or alteration of all or part of a property;

(b) isolation from or alteration of its surrounding environment;

(c) introduction of visual, audible, or atmospheric elements that are out of character with the property and its setting.

2. The Department of Transportation Act of 1966 (49 U.S.C. § 1653(f)), which includes the following requirements:

(f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

Because § 138 of the Federal-Aid Highway Act of 1968 is almost identical to § 4(f) of the Department of Transportation Act of 1966, we include § 138 (23 U.S.C. § 138) herein:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, [August 23, 1968], the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

3. The Federal-Aid Highway Act of 1968 (23 U.S.C. § 128(a)) which provides:

(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such

a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State Highway Department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway.

(b) When hearings have been held under subsection (a), the State Highway Department shall submit a copy of the transcript of said hearings to the Secretary, together with the certification.

Policy and Procedure Memorandum 20–8, 34 Fed.Reg. 727, 23 C.F.R.App. A, was promulgated by the Department of Transportation on January 15, 1969, to implement 23 U.S.C. § 128(a), and provides in pertinent part as follows:

3. *Applicability*

(a) This PPM applies to all Federal-Aid Highway Projects.

(b) If preliminary engineering or acquisition of right of way related to an undertaking to construct a portion of a Federal-Aid Highway Project is carried out without Federal-Aid funds, subsequent phases of the work are eligible for Federal-Aid funding only if the nonparticipating work after the effective date of this PPM was done in accordance with this PPM.

\*   \*   \*   \*   \*   \*

6. *Hearing Requirements*

(a) Both a corridor public hearing and a design public hearing must be held, or an opportunity afforded for those hearings, with respect to each Federal-Aid Highway Project . . .

8. *Public Hearing Procedures*

(a) Notice of public hearing:

   (1) When a public hearing is to be held, a notice of public hearing shall be published at least twice in a newspaper having general circulation in the vicinity of the proposed undertaking. The notice should also be published in any newspaper having a substantial circulation in the area concerned; such as foreign language newspaper and local community newspapers. The first of the required publications shall be from 30 to 40 days before the date of the hearing, and the second shall be from 5 to 12 days before the date of the hearing. The timing of additional publications is optional.

   (2) In addition to publishing a formal notice of public hearing, the State Highway Department shall mail copies of the notice to appropriate news media, the State's resource, recreation, and planning agencies, and appropriate representatives of the Departments of Interior and Housing and Urban Development. The State Highway Department shall also mail copies to other federal agencies, and local public officials, public advisory groups and agencies who have requested notice of hearing and other groups or agencies who, by nature of their function, interest, or responsibility, the highway department knows or believes might be interested in or affected by the proposal.

   (3) Each notice of public hearing shall specify the date, time and place of the hearing and shall contain a description of the proposal. To promote public understanding, the inclusion of a map or other drawing as part of the notice is encouraged. The notice of public hearing shall specify that maps, drawings, and other pertinent information developed by the State Highway Department and written views received as a result of the coordination outlined in Paragraph 5.a will be available

for public inspection and copying and shall specify where this information is available; namely, at the nearest State Highway Department office or at some other convenient location in the vicinity of the proposed project . . . .

(b) Conduct of public hearing:

\*  \*  \*  \*  \*  \*

(2) Provision shall be made for submission of written statements and other exhibits in place of, or in addition to, oral statements at a public hearing. The procedure for the submissions shall be described in the notice of public hearing and at the public hearing. The final date for receipt of such statements or exhibits shall be at least 10 days after the public hearing.

4. The National Environmental Policy Act of 1969 (42 U.S.C. § 4331(b)(4) (hereafter "NEPA"), which provides in pertinent part:

In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . .

\*  \*  \*  \*  \*  \*

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain wherever possible, an environment which supports diversity and variety of individual choice; . . .

Pursuant to this broad policy, the Act provides at § 4332 that:

The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall— . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

## CONCLUSION

■ Until each and every facet of the Congressional mandates heretofore cited are complied with, the defendants will be enjoined from taking any steps leading to the condemnation of any portion of the property known as Tuckahoe Plantation, and the defendant Volpe will be enjoined from granting any further approval or federal assistance to any part of the highway commonly known as the Tuckahoe Segment.

An appropriate order will issue.