MARYLAND WILDLIFE FEDERATION
and Route # 40 Advocates, Inc.

v.

Drew LEWIS, Secretary of the United States Department of Transportation, and James J. O'Donnell, Secretary, Maryland Department of Transportation and Emil Elinsky, Division Administrator, Federal Highway Administration for Maryland and Albert Smith, Federal Co-Chairman for the Appalachian Regional Commission and Governor Harry Hughes, as the Maryland Delegate to the Appalachian Regional Commission and George Turner, as Regional Federal Highway Administrator for Region III.

Civ. No. HM81–2227.

United States District Court,
D. Maryland.

March 21, 1983.

Dept. of Transp., Washington, D.C., Robert L. McCloskey, Gen. Counsel, Terrence M. O'Connor, Sr. Asst. Gen. Counsel, Appalachian Regional Com'n, Washington, D.C., Francis J. Locke, Stephen H. Sachs, Atty. Gen., for defendant. Jeanne D. Hitchcock, Dorothy Beatty, Robert B. Harrison, III, Louisa Goldstein, Asst. Attys. Gen., Baltimore, Md., for Maryland Dept. of Transp.

## MEMORANDUM

HERBERT F. MURRAY, District Judge.

This case involves the completion of a section of the National Freeway in Western Maryland. The National Freeway project is part of the Appalachian Regional Development Program which Congress authorized in 1965. The purpose of the project is to enhance industrial and economic opportunities in Appalachia by providing a direct transportation link between the Ohio Valley and the Atlantic seaboard. Corridor E of the National Freeway, known as the U.S. Route 40, extends from Morgantown, West Virginia to Hancock, Maryland. Corridor E has been completed since 1976 with the exception of two segments, designated as Sections I and II. In 1973, the U.S. Department of Transportation, the Federal Highway Administration, the Maryland Department of Transportation, and the Maryland State Highway Administration prepared a Draft Environmental Impact Statement/Section 4(f) Statement covering both Sections I and II. On December 12 and 13, 1973, the agencies held public hearings for the discussion of alternative routes. In August 1976, they circulated a Final Environmental Impact Statement (FEIS)/Section 4(f) Statement for Section II, alone. The Federal Highway Administrator approved the proposal in June 1977 and construction began on Section II in 1981. The state and federal agencies determined that further study was required for the route selection of Section I, particularly as it impacted on historical sites. That route selection is in issue in this case.

Section I extends from Wolfe Mill to M.V. Smith Road in Allegany County, Maryland. The section traverses several

Monroe Jon Mizel, Kensington, Md., for plaintiff.

J. Frederick Motz, U.S. Atty., Price Gielen, Asst. U.S. Atty., Baltimore, Md.

Patricia J. Beneke, Atty., Dept. of Justice, Land & Natural Resources Div., Deborah A. Dull and James Scouten, Attys.,

park, forest and historic resources. The major park and forest resources are the Green Ridge State Forest covering 32,000 acres, and Rocky Gap State Park, encompassing 3,500 acres. The major historic resources are the Breakneck Valley Historic District, the Flintstone Historic District, and the Hinckle Group. The Breakneck Valley Historic District contains thirty-one historic sites over an area of 6,270 acres. The Flintstone Historic District consists of twenty-five individually significant sites. The Hinckle Group includes three sites and extends over approximately 245 acres.

As a result of the agencies' determination that further study was necessary for the route selection of Section I, the State Highway Administration prepared a study entitled "Section 4(f) Involvement, Supplement to Draft Environmental Document," which discussed the impact of each proposed highway alignment on historical properties. In January 1978, the agencies held a supplemental location public hearing to inform the public of the status of studies of Section I and to provide a forum for public comment. On August 7, 1980, the Federal Highway Administrator approved the FEIS/Section 4(f) Statement for Section I. That document recommended that the highway be built along alternate route AGBF2.

The 1980 FEIS discussed five major alternative alignments: AGBF2; AGEA; AGEENA; No-Build; and two alternatives for upgrading existing Route 40.

Alternate AGBF2, the selected route, is the southernmost and shortest alignment. It is approximately 16.9 miles long and is located two miles south of existing Route 40. Construction of the highway along AGBF2 will necessitate the taking of 176 acres of the Green Ridge State Forest. It will use eighty-one acres of the Breakneck Historic District, taking two historic sites and affecting ten others. It also requires the relocation of twenty-four residences, one business, and four farms.

Alternate AGEA is the northernmost alignment. It follows existing Route 40 and is designed to freeway standards. AGEA would require the taking of twenty-

two acres from the Rocky Gap State Park and 133 acres from Green Ridge State Forest. The right-of-way also traverses a potentially designated wildland. This alternate would use twenty-three acres from the Breakneck Historic District, twelve acres from the Flintstone Historic District, and would take ten historic properties. It would require the relocation of seventy-eight residences, eleven businesses, and three farms. The agencies eliminated AGEA from further consideration because, in addition to the factors listed above, that alternate would have had adverse noise impacts and would have involved extensive stream relocations.

AGEENA is the middle alignment. The agencies rejected this alternative because it would require the taking of 310 acres of the Breakneck Historic District, including two historic structures and fourteen other individually significant historic properties. The Advisory Council on Historic Preservation found that the impact of this taking would be unmitigable. AGEENA would also take 132 acres of the Green Ridge State Forest and would require the relocation of thirty-six residences and four businesses.

The no-build alternate would involve no new construction, but would provide for normal maintenance of existing Route 40. Although this alternate would have no adverse effects on historic, forest or park areas, the agencies did not select it because it would not provide for safe and efficient travel along Section I. Safety problems would result primarily from reduced design standards in relation to curvature and grade, and from uncontrolled access to the road. The road would thus involve substantial accident costs. Further, by creating a substandard link in the highway, the no-build option would be inconsistent with the goal of the Appalachian Regional Development Program to promote economic and industrial growth in Western Maryland.

Two alternatives called for upgrading existing Route 40. The first, Alternate A, called for a controlled access highway with a design speed of 60 m.p.h. The agencies rejected it because it would take fourteen

acres from Rocky Gap State Park, 107 acres from Green Ridge State Forest, and would require .20,100 feet of stream relocation. Alternate A would also impact on thirty-five acres from two historic districts, displacing ten historic structures. Finally, it would require the relocation of ninety-one residences, fifteen businesses, three farms, and three non-profit organizations.

During the project studies, a local group suggested that an adequate facility could be constructed within the existing right-of-way for U.S. Route 40. This alternate, known as the Fourth Alternate, was not designed to expressway standards. The State Highway Administration conducted a feasibility study of this alternate but rejected it due to: (1) low design speeds (50 m.p.h.) in five portions of the road; (2) inadequate space for safety grading; (3) capacity restrictions and safety problems with at-grade intersections and other exit points; (4) four miles of stream relocations; and (5) impact on thirteen historic sites, two historic districts, Rocky Gap State Park and Green Ridge State Forest. The study concluded that the Fourth Alternate would also require the relocation of more residences and businesses than AGBF2, the selected alternate. To expand the right-of-way to allow for the necessary median widening and safety grading would require twenty-two acres from the Rocky Gap State Park, 215 acres from Green Ridge State Forest, twelve acres from the Flintstone Historic District, and twenty-three acres from the Breakneck Historic District.

Plaintiff Maryland Wildlife Federation has filed this suit challenging the selection of alternate AGBF2 for the completion of Section I. Plaintiff asserts three causes of action. Count I of the complaint asserts that the defendants, in preparing the FEIS, failed to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, et seq. (1977), by improperly segmenting the project, failing to consider reasonable alternatives to the project, failing to consider adequately the environmental impacts of the project, and failing to revise and circulate the Draft Environmental Impact Statement. Plaintiffs' second cause of action alleges that agency's rejection of non-expressway alternatives for the highway was arbitrary and capricious. Count III alleges that defendants failed to comply with Section 4(f), Department of Transportation Act, 49 U.S.C. § 1653(f) (1976) and the identical provision of the Federal Aid Highway Act, 23 U.S.C. § 138 (1966).

On April 5, 1982, plaintiff filed a motion for partial summary judgment only as to its third cause of action. Both state and federal defendants opposed the motion in memoranda filed June 14, 1982. Defendants then filed cross-motions for summary judgment as to each cause of action. Also pending before the court is the joint motion of state and federal defendants to dismiss the complaint as to defendants Albert Smith and Harry Hughes who serve, respectively, as federal co-chairman and delegate to the Appalachian Regional Commission. Defendants claim that Messrs. Smith and Hughes are not subject to NEPA or the Department of Transportation Act. The court's disposition of the cross-motions for summary judgment, however, renders the latter motion moot.

The court will first consider the cross-motions for summary judgment as to Count III.

In its third cause of action, plaintiff alleges noncompliance with Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 1653(f) (1976) and the identical provision of the Federal Highway Act, 23 U.S.C. § 138 (1966). These statutes prohibit the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through any publicly-owned parkland, recreation area, historical site, or wildlife or wildfowl refuge unless "no feasible and prudent alternative" exists and the project includes "all possible planning to minimize harm" to the protected property. Specifically, the statute provides:

It is hereby declared to. be the national policy that special effort should be made to preserve the natural beauty of the

countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

In the leading case of *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970), the Supreme Court interpreted the Secretary's statutory authority and established the appropriate standard of judicial review.

The plaintiffs in *Overton Park* were private citizens and local and national conservation groups who challenged the Secretary's authorization for the construction of a six-lane interstate highway through a public park in Memphis, Tennessee. Overton Park was a 342 acre city park located near the center of Memphis. The park contained a zoo, a municipal golf course, an outdoor theater, a variety of other recreational facilities, and 170 acres of forest. The proposed highway would have destroyed twenty-six acres of the park and severed the zoo from the rest of the park. The highway, which was a segment of Interstate Highway I–40, would have provided Memphis with a major east-west expressway, allowing easier access to downtown Memphis from the city's eastern suburbs. The plaintiffs claimed that the Secretary's action was invalid because of his failure to comply with section 4(f). They challenged the procedural regularity of his decision and argued, on the merits, that "feasible and prudent" alternatives existed to the use of the park. Further, they argued that even if the alternative routes were not feasible and prudent, the existing plan did not include all possible measures for reducing harm to the park. The district court rejected plaintiff's claim and granted the Secretary's motion for summary judgment; the Sixth Circuit Court of Appeals affirmed. The Supreme Court reversed on the narrow ground that the lower courts based their review solely on the litigation affidavits rather than the whole administrative record, as required by the Administrative Procedure Act. 5 U.S.C. § 706 (1977). In its opinion, however, the Court undertook a detailed discussion of section 4(f).

■ The court first delineated the scope of the Secretary's authority and discretion. The Court began with the proposition that section 4(f) provides a clear and specific directive. The statutory language is "a plain and explicit bar to the use of federal funds for construction of highways through parks—only the most unusual situations are exempted." 401 U.S. at 411. The Secretary's first inquiry must focus on whether any "feasible and prudent" alternatives exist to the use of 4(f) property. The former requirement admits of little administrative discretion. In order to find that no feasible alternatives exist, the Secretary must find that "as a matter of sound engineering it would not be feasible to build the highway along any other route." *Id.* The Court also read narrowly the requirement that no other "prudent" route exists. This inquiry does not require the Secretary to engage in a wide-ranging balancing of competing interests. Rather, the Secretary cannot approve the destruction of 4(f) properties unless he finds that alternative routes present "unique problems." *Id.* at 413, 91 S.Ct. at 822. The Court indicated that unique problems may exist when there were "truly unusual factors present in a particu-

lar case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes." *Id.*

■ The Court next turned to the appropriate standard for judicial review. It first found that the Secretary's decision is entitled to a presumption of regularity. This presumption, however, does not shield his action from a careful, in-depth judicial review. *Id.* at 415, 91 S.Ct. at 823. This review should consist of three inquiries. First, the court is required to decide whether the Secretary acted within the scope of his authority. In order to satisfy this requirement, the court must find that "the Secretary could have *reasonably believed* that in this case there are no feasible alternatives or that alternatives involve unique problems." *Id.* at 416, 91 S.Ct. at 823. (emphasis added). Second, the reviewing court must find that the Secretary's actual choice was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. To make this finding the court must consider "whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Id.* The Supreme Court added the cautionary instruction that, although the reviewing court must carefully examine the facts, it is not empowered to substitute its judgment for that of the agency. The final inquiry is whether the Secretary's action satisfied the necessary procedural requirements. *Id.* at 417, 91 S.Ct. at 824.

The Fourth Circuit has rendered no decision interpreting the Supreme Court's language in *Overton Park.*

In the instant case, the court will proceed with the three-step review of the Secretary's action in reverse order.

The requirement of procedural regularity is not in issue here. Plaintiff apparently does not contest the fact that the Secretary's action conformed with the necessary procedural requirements.

■ Turning next to the question of whether his choice was arbitrary and capricious, the court finds that it was not. The extensive administrative record filed with the court demonstrates that the Secretary's decision was based on a consideration of all relevant factors, including the impact of each alignment on 4(f) properties, safety considerations, the cost and community disruption resulting from each alternative, and the extent of mitigation efforts. There is no evidence that his decision constituted a clear error in judgment. In light of the cautionary instruction that the court should not substitute its own judgment for that of the agency, the court finds that the Secretary's action was not arbitrary or capricious.

■ The final inquiry is whether the Secretary acted within the scope of his authority. This inquiry tests the reasonableness of the Secretary's determination that there were no feasible and prudent alternatives to the selected route. *See, id.* at 416, 91 S.Ct. at 823. The Secretary's decision could not have rested on a finding that the alternative routes were not feasible. The record plainly shows that, as a matter of sound engineering, the road could have been built along any of the other alignments. The Secretary could reasonably have believed, however, that the alternative routes involved unique problems and were, therefore, imprudent.

The Secretary reasonably rejected the no-build proposal and the Fourth Alternate, which calls for upgrading existing Route 40 to less than expressway standards. Although these alternatives would not involve cost or community disruption of extraordinary magnitudes, they do present unique problems in the sense that they do not fulfill the purpose for which Congress authorized construction of the new road.

■ The purpose of the Appalachian Regional Development Act (ARDA) is to establish a joint state and federal framework for fostering economic self-sufficiency in the Appalachian region by improving physical and transportation facilities and developing human resources. ARDA, 40 U.S.C. App. § 2 (1969). This purpose is reflected in the Federal Aid Highway Manual which sets forth "Approved Criteria for Appalach-

ian Development System." Vol. 6, Ch. 9, Sec. 10, subsection 1, Attachment 2. Those criteria provide in pertinent part:

3. The Appalachian Development Highway System shall be designed in accordance with prevailing Federal-aid highway standards, specifications, policies and guides applicable to the projected type and volume of traffic.

4. The design and construction shall be coordinated so as to achieve continuity and reasonable uniformity throughout the System, and provide for an average travel speed of approximately 50 mph between major termini of the System, commensurate with terrain. This shall be considered the prime objective . . .

5. The projected type and volume of traffic shall be considered in the determination of access control. Provision should be made for partial order or full control of access to preserve safety and capacity for traffic.

Neither the no-build proposal nor the Fourth Alternate would provide for controlled access or otherwise improve the road to highway standards. Both would involve safety problems resulting from reduced design standards in relation to curvature and grade. The Secretary thus could reasonably have concluded that the no-build and Fourth Alternate would not satisfy the purpose of the ARDA and were, therefore, imprudent. *See Louisiana Environmental Society v. Coleman,* 537 F.2d 79, 85 (5th Cir.1976).

All of the remaining alternates impact on some 4(f) property. Alternate A, which called for upgrading existing Route 40 to highway standards, would take fourteen acres from the Rocky Gap State Park, 107 acres from Green Ridge State Forest, thirty-five acres from two historic districts, and ten historic structures. Alternate AGEA would take twenty-two acres from Rocky Gap State Park, 133 acres from Green Ridge State Forest, twenty-three acres from the Breakneck Historic District, twelve acres from the Flintstone Historic District and would cross a potential wild-

land. Alternate AGEENA would take 132 acres from the Green Ridge State Forest and 310 acres of the Breakneck Historic District. The selected alternate, AGBF2, will take 176 acres of the Green Ridge State Forest, eighty-one acres of the Breakneck Historic District and two historic sites.

■ Plaintiff contends that the Secretary, faced with a choice between these alternatives, was required to prefer "greenlands" to other types of 4(f) property. Plaintiff cites *Overton Park* in support of its position. Plaintiff relies on the following language. "But the very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case . . ." 401 U.S. at 413, 91 S.Ct. at 822. Plaintiff's reliance on *Overton Park,* however, is misplaced. The route selection at issue in that case did not involve a choice between several types of 4(f) property. The only protected property threatened by the highway construction was Overton Park itself. Thus, the court's emphasis on the preservation of parkland cannot be construed as requiring the Secretary to prefer parkland or green spaces to other statutorily-protected areas.

■ Defendants, on the other hand, have cited *Louisiana Environmental Society v. Coleman, supra,* in support of the proposition that the Secretary was free to choose among the remaining alternates because they would have had a substantially equal impact on 4(f) properties. In that case, the Fifth Circuit Court of Appeals stated that "if an alternate would not *minimize* harm it would not have to be accepted in lieu of the suggested or adopted route. The Secretary would be free to choose between equal [sic] damaging alternatives." 537 F.2d at 86. Defendants argue that, in this case, the Secretary could have concluded that each of the remaining alternates impacted equally on 4(f) properties. He therefore was free to choose between them and could reasonably have believed that the alternates to AGBF2 presented unique problems.

The court is persuaded by defendants' argument and finds that the Secretary reasonably could have believed that there are no feasible and prudent alternatives to the selected route, AGBF2.

■ Finally, the court must consider whether the Secretary's determination that the project includes all possible planning to minimize harm was reasonable. The Federal Highway Administration, the State Highway Administration, the Advisory Council on Historic Preservation, and the Maryland Department of Natural Resources have developed extensive plans to mitigate harm to historic resources and to the Green Ridge State Park. Specifically, the Advisory Council on Historic Preservation, the State Highway Administration, and the Federal Highway Administration entered into a memorandum agreement providing for a design concept of the highway that will minimize damage to the natural and cultural environment. Similarly, the State Highway Administration and the Maryland Department of Natural Resources have entered into a detailed memorandum agreement designed to minimize damages to the Green Ridge State Forest. Finally, the Vail Pass Report, which describes techniques for design, landscape, and erosion control to minimize the impact of highway construction, will be used as a guide in designing the portion of the road that passes through the Green Ridge State Forest.

The court has reviewed the memorandum agreements and the Vail Pass Report and finds that the Secretary could reasonably have concluded that there has been all possible planning to mitigate the highway's impact on the surrounding 4(f) property.

For all of the reasons stated, the court concludes that the uncontradicted facts in this case demonstrate that defendants complied with section 4(f) in selecting alternate AGBF2. The court will accordingly deny plaintiff's motion for partial summary judgment and grant the State and Federal defendants' cross-motions for summary judgment as to the third cause of action.

The court will next consider defendants' motions for summary judgment as to plaintiff's first and second causes of action.

In its first cause of action, plaintiff alleges that the FEIS for Section I fails to comply with NEPA because of: (1) improper segmentation of the project; (2) inadequate consideration of alternatives; (3) failure to revise and circulate the Draft EIS; and (4) failure to consider adequately the project's environmental impacts. Defendants contend that, as a matter of law, the FEIS is adequate in each respect.

In *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) the Supreme Court articulated the following standard for judicial review of administrative decisions in NEPA cases.

> In *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558 [98 S.Ct. 1197, 1219, 55 L.Ed.2d 460] (1978), we stated that NEPA, while establishing "significant substantive goals for the Nation," imposes upon agencies duties that are "essentially procedural." As we stressed in that case, NEPA was designed "to insure a fully informed and well-considered decision," but not necessarily "a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decision-making unit of the agency." *Ibid. Vermont Yankee* cuts sharply against the Court of Appeals' conclusion that an agency, in selecting a course of action, must elevate environmental concerns over other appropriate considerations. On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken' "

444 U.S. at 227, 100 S.Ct. at 499–500. The reviewing court's role is thus a limited one.

Plaintiffs who challenge the adequacy of an EIS have the burden of proof on all issues. *See Monroe County Conservation*

Council v. Adams, 566 F.2d 419, 422 (2d Cir.1977), cert. denied, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); Sierra Club v. Froehlke, 534 F.2d 1289, 1300 (8th Cir.1976). Moreover, plaintiffs must show the deficiency of the EIS by a preponderance of the evidence; a prima facie showing will not suffice. Sierra Club v. Morton, 510 F.2d 813, 818 (5th Cir.1975).

Plaintiff first argues that the defendants improperly segmented the project so as to preclude "consideration of environmental matters on a broad scope and meaningful valuation of alternatives" in violation of 23 C.F.R. § 771.5(a). The Federal Highway Administration maintains the policy that "in the development of a project a systematic interdisciplinary approach be used to assess engineering considerations and beneficial and adverse social, economic, environmental, and other efforts." 23 C.F.R. § 771.2. To achieve this goal of systematic project evaluation, FHWA regulations, 23 C.F.R. § 771.5(a), provide that "[p]iecemealing proposed highway improvements in separate EIS's is to be avoided." See National Wildlife Federation v. Lewis, 519 F.Supp. 523 (D.Conn.1981).

Although the regulations do not define the proper scope of an EIS, they do provide some guidance on that subject. The highway section identified in the EIS "should include the *total length of highway between logical termini* even though only a short length of the total identified highway section is proposed for construction or reconstruction within the multi-year work program." 23 C.F.R. § 771.5(a). (emphasis added). The definition in the regulations of a "highway section" contains a partial definition of "logical termini." "A 'highway section' is a highway development proposal between logical termini (*population centers, major traffic generators, major crossroads, etc.*) as normally included in a location study of a multi-year highway improvement program." 23 C.F.R. § 771.3(g) (emphasis added).

The case law has amplified and expanded upon these guidelines. The relevant decisions establish four factors that the court

must consider in determining whether a highway section is sufficiently long to permit a separate EIS. Lewis, supra, at 529.

The first factor is the "nature of the proposal." Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 740 (D.Conn. 1972). The second is whether the project has "independent utility," Daly v. Volpe, 514 F.2d 1106, 1110 (9th Cir.1975), or whether, instead, "construction of this span is dependent upon construction of the entire highway." Citizens for Balanced Environment & Transportation, Inc. v. Volpe, 376 F.Supp. 806, 813 (D.Conn.1974), aff'd, 503 F.2d 601 (2d Cir.1974), cert. denied sub nom. Citizens for Balanced Environment & Transportation, Inc. v. Coleman, 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975). The third is whether the project connects "logical," or "major," termini. 23 C.F.R. § 771.3(g); Indian Lookout Alliance v. Volpe, 484 F.2d 11, 19 (8th Cir.1973). The fourth is "whether the length selected assures adequate opportunity for the consideration of alternatives ... required by [NEPA]." Committee to Stop Route 7 v. Volpe, supra, 346 F.Supp. at 740. As the court's analysis will demonstrate, these factors overlap to some extent.

The nature of the proposal at issue here is the completion of the last seventeen-mile segment of the National Freeway in Western Maryland. In light of this objective, the already-completed portions of the highway at either end of Section I form the project's natural boundaries. Those two termini also determine the proper scope of the EIS. See Indian Lookout Alliance v. Volpe, 484 F.2d 11, 18 (8th Cir.1973). Although Section I is unquestionably part of the larger National Freeway Project, that fact does not require that the EIS encompass a larger highway section. Except for Sections I and II, the road has been completed since 1976. Similarly, construction on Section II began in 1981. The nature of this project thus supports the scope of the FEIS for Section I.

In Movement Against Destruction v. Volpe, 361 F.Supp. 1360, 1384 (D.Md.1975), Judges Thomsen and Miller of this Court

articulated the notion of "independent utility" as follows:

> In some situations the relationship of several roads or parts of road may be so interrelated that no one road or part of a road can function as an efficient carrier of motor vehicles except in conjunction with the others. In such a case, it is possible that it would be necessary to have an EIS which would have as its subject all of the roads or parts of roads which could only function efficiently as a unit. In such an unusual situation, the several roads would not constitute a system of highways but would be treated essentially as a single highway for the purpose of the EIS.

In *Thompson v. Fugate,* 347 F.Supp. 120 (E.D.Va.1972), the court dealt with such an interrelated project. Plaintiff in that case challenged the agency's plan for the construction of a circumferential highway around Richmond, Virginia. The court held that the project could not be split up into separate twenty-one mile and eight-mile segments for purposes of assessing environmental impact; rather, the entire project must be considered as a whole. *Id.* at 124. The instant case is plainly distinguishable from *Thompson.* The need for a road through Section I does not depend upon the construction of the rest of the highway. The road will serve the independent functions of facilitating the flow of local traffic and eliminating a hazardous section of the highway. The court concludes, therefore, that the project encompassed by the EIS has independent utility.

The third factor for the court's consideration is whether the project connects logical or major termini. As noted earlier in this opinion, the FHWA regulations suggest that logical termini may consist of "population centers, major traffic generators, major crossroads, etc." 23 C.F.R. § 771.3(g). This project does not connect termini fitting any of those descriptions. Because the road will connect two completed segments of the highway, however, the endpoints of the project are logical, if not inevitable.

Finally, the court must determine whether the selected segment is sufficiently long to assure adequate consideration of alternatives as required by NEPA. In *Committee to Stop Route 7 v. Volpe,* 346 F.Supp. 731 (D.Conn.1972), the court stated the rationale for this requirement.

> Alternatives to building an expressway are not brought into focus where consideration is given to just one segment. Moreover, placement of one segment tends to narrow the range of choices for placement of the remainder of the entire highway, thereby precluding adequate consideration of alternative routes.

*Id.* at 740. In that case, the court found that a 3.1 mile segment of a thirty-one mile highway was an inappropriately small subject for an EIS. In the instant case, however, this requirement has little significance. Because the purpose of Section I is to link previously constructed highway segments, the defendants had little choice as to the length of the project. *See Lewis, supra,* 519 F.Supp. at 531. The defendants' sole exercise of discretion was their determination to consider Sections I and II separately. Although the agency originally considered the two sections together, the EIS sets forth the reasons for their separation:

> Indeed, the two sections, while initially considered together can easily be considered separately without compromising decisions to be made in either, for the following reasons:
>
> 1. The proposed National Freeway is divided into two distinct study areas by a common portion of highway which has already been reconstructed to Interstate standards. Thus, there is a basis for designation of the study area to the west of this existing adequate segment Section I and to the east Section II. From the outset, the two sections, I and II, have been treated as separate entities.
>
> 2. All Section I and Section II alternatives connect with the adequate section of highway described above. The selection of any alternative in Section II, therefore, will not preclude the selection of any alternative in Section I in order to maintain continuity.

478

3. The same design standards were applied to all build alternatives in both sections. The selection of any particular alternative in Section II would not, therefore, necessitate selection of any one alternative in Section I in order to maintain design compatibility.

The court finds that separate consideration of the two sections was reasonable and well within the agency's discretion. Indeed, the soundness of that decision has been borne out by the number and range of alternatives considered for Section I. The court finds that the seventeen-mile segment known as Section I is sufficiently long to permit adequate consideration of alternative routes.

Having considered the four factors for determining whether a highway section is an appropriate subject of a separate EIS, the court concludes that Section I satisfies each criteria. Plaintiff's allegation of improper segmentation is, therefore, without merit.

Plaintiff next contends that the defendants failed to consider "adequately or at all reasonable alternatives to the project, including, *inter alia*, (1) improvements to existing routes, (2) an interstate highway along an entirely different corridor, such as Route # 40 that would avoid or minimize the threat presented by this project ..."

■ Although the comparison of alternatives to a proposed action are deemed to be the "heart of the environmental impact statement," 40 C.F.R. § 1502.14, the agency's obligation to study, develop, and describe alternatives is subject to a "rule of reason." *Hart and Miller, etc. v. Corps of Engineers, etc.,* 505 F.Supp. 732 (D.Md. 1980). In *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519–551, 98 S.Ct. 1197–1215, 55 L.Ed.2d 460 (1978), the Supreme Court stated:

[A]s should be obvious even upon a moment's reflection, the term "alternatives" is not self-defining. To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some

notion of feasibility. ... Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

■ Plaintiff appears to be concerned primarily with the range of alternatives considered rather than the level of scrutiny given to each proposal. This concern is unfounded. Contrary to plaintiff's assertion, the administrative record reflects that defendants gave ample consideration to proposals for improving the existing road and for upgrading Route 40. Moreover, alternate AGEA called for construction of the highway along the same corridor as Route 40. Defendants thoroughly reviewed each of these alternates and, in the FEIS, set forth the costs and benefits of each. Defendants also considered a middle route, AGEENA, in addition to the selected alternate. Indeed, plaintiff has failed to identify any alternate, feasible or otherwise, that defendants failed to consider. The court concludes that defendants' consideration of alternatives to the proposed action satisfies the "rule of reason" standard of judicial review.

Plaintiff's third argument is directed at defendants' "failure to revise the Draft EIS's and to circulate them for public review, although over several years passed between their circulation and approval of the final statements, in violation of 23 C.F.R. § 171.12(*o*)."

■ 23 C.F.R. § 171.12(*o*) provides, in pertinent part, that "the draft EIS shall, if necessary, be revised unless the final EIS is submitted to FHWA [the Federal Highway Administration] for adoption within three years from the date the draft EIS was circulated". The regulations indicate the

circumstances in which a revised EIS may be necessary. 23 C.F.R. § 177.15 states, in pertinent part, that:

> Supplements will be necessary when substantial changes are made in the proposed action that will introduce a new or changed environmental effect of a significance to the quality of the human environment or significant new information becomes available concerning the action's environmental aspects.

The question for the court is thus not merely whether three years elapsed from the time the Draft EIS was circulated to the time it was adopted, but, instead, whether three years elapsed and a revision was necessary.

Plaintiff has pointed to no substantial changes in the proposed action and no environmentally-significant new information, and the court is aware of none, that required defendants to revise and circulate the Draft EIS. In this situation, the regulation allows the agency discretion in deciding whether or not to revise the Draft EIS. Certainly the defendants' failure to revise the statement did not render it so devoid of information about the environmental consequences of their action that the decision-makers were unable to make a reasoned decision. *See National Center for Law v. Landrieu,* 496 F.Supp. 716 (D.S.C.1980), *aff'd* 635 F.2d 324 (4th Cir.1980). The court concludes that the FEIS is not deficient because of defendants' failure to revise and circulate the Draft EIS.

Finally, defendants challenge the adequacy of the FEIS for Section I on the ground that it fails to adequately consider significant impacts of the project, including (1) the impacts of significantly higher energy prices and the reduced supply of oil and gasoline between 1973 (when the DEISs were circulated) and 1979 on the net [sic] for the project and the economy of the region. (2) the impact of significantly lower population projections on the need for the project.

 The "rule of reason" standard, which governs the range of alternatives that an EIS must consider, also governs the

extent to which the agency must scrutinize or discuss those alternatives. *Hart and Miller, supra,* 505 F.Supp. at 749, 752. As the court stated in *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1375 (2d Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1976),

> In making such a determination a court is governed by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

 The court notes, first, that the EIS includes a limited discussion of the energy impacts of the proposed alignment. The defendants' failure to enlarge upon that discussion, however, does not render the FEIS deficient. The Supreme Court's criticism of the plaintiff's argument in *Vermont Yankee, supra,* applies to plaintiff in this case as well. In *Vermont Yankee,* plaintiffs urged the court to overturn the agency's action because the agency failed to consider "energy conservation" as an alternative to the construction of a nuclear reactor. The court refused to do so, stating that:

> In the first place, while it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' positions and contentions.... Indeed, administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be considered" . . .

435 U.S. at 554–55, 98 S.Ct. at 1217. Here, plaintiffs attack the EIS for its failure to consider the impact of the price and supply of oil on the need for the highway project and the economy of Western Maryland. Such an inquiry would require the agency to speculate on a limitless range of economic developments that might affect the price and supply of oil. The agency would also be required to estimate the impact of those developments on the economy of Western Maryland and the flow of traffic through the region. The courts have recognized that NEPA does not require such a speculative and wide-ranging endeavor. *Vermont Yankee, supra,* 435 U.S. at 554–55, 98 S.Ct. at 1217; *Movement Against Destruction v. Trainor,* 400 F.Supp. 533, 554 (D.Md.1975); *Essex County Preservation Ass'n v. Campbell,* 399 F.Supp. 208 (D.Mass.1975). The same reasoning answers plaintiff's allegation that the EIS fails to adequately consider the demographics of Western Maryland. In the court's view, the defendants compiled the EIS in good faith and set forth in it sufficient information to permit the decisionmakers to assess the environmental factors and make a reasoned decision on the merits of the proposal.

Having considered each of plaintiff's challenges to the adequacy of the FEIS for Section I and having concluded that they are without merit, the court will grant defendants' motions for summary judgment as to the first cause of action.

Finally, plaintiff's second cause of action alleges that defendants' rejection of all nonexpressway alternatives was arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701, 706 (1977).

■■■■ In order to uphold an agency's action, the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1977), requires the reviewing court to find that the action was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In the court's opinion, to characterize the defendants' action in this case as arbitrary and capricious would be to deprive those words of any meaning.

■■■■ NEPA does not require the agency's decision on the merits to favor environmental protection over other relevant factors but simply requires the agency to consider the environmental consequences of its decision. *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1979); *Environmental Defense Fund, Inc. v. Mathews,* 410 F.Supp. 336 (D.D.C.1976). The administrative record plainly shows that defendants fulfilled their statutory duty. Although defendants concluded that the nonexpressway alternatives would impact least on the natural and cultural environment, they were not for that reason obligated to adopt those alternatives. Instead, defendants were entitled to take into consideration the purpose of the highway project to foster economic growth in Western Maryland. The defendants judiciously weighed the harm to the environment against the benefits to be derived from each proposal, including the nonexpressway alternatives. The uncontroverted facts in this case demonstrate that defendants' choice was neither arbitrary nor capricious. The court will therefore grant defendants' motion for summary judgment as to plaintiff's second cause of action.

### ORDER

For all of the reasons outlined in the foregoing memorandum, it is this 21st day of March 1983, by the United States District Court for the District of Maryland,

ORDERED:

(1) that plaintiff's motion for partial summary judgment be, and the same hereby is, *Denied;*

(2) that the cross-motions of state and federal defendants for summary judgment as to Counts I, II and III of the complaint be, and the same hereby are, *Granted;*

(3) that the joint motion of state and federal defendants for dismissal of the complaint against defendants Hughes and Smith be, and the same hereby is, *Denied* as moot; and

(4) that the Clerk of the Court mail copies of this memorandum and order to the parties.