747 F.2d 229
 21 ERC 1884
 MARYLAND WILDLIFE FEDERATION and Route # 40 Advocates, Inc.,
Appellants,
v.
Elizabeth H. DOLE, Secretary of the United States Department
of Transportation, and Lowell K. Bridwell, Secretary,
Maryland Department of Transportation and Emil Elinsky,
Division Administrator, Federal Highway Administration for
Maryland and Albert Smith, Federal Co-Chairman for the
Appalachian Regional Commission and Governor, Harry Hughes,
as the Maryland Delegate to the Appalachian Regional
Commission and George Turner, as Regional Federal Highway
Administrator for Region III, Appellees.
 No. 83-1429.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 6, 1984.
Decided Oct. 25, 1984.
 
 Charles H. Montange, Washington, D.C., for appellants.
 Louisa H. Goldstein, Baltimore, Md. (Dorothy A. Beatty, Robert B. Harrison, III, Asst. Attys. Gen., Stephen H. Sachs, Atty. Gen., of Maryland, Baltimore, Md., on brief) and Ellen J. Durkee, Dept. of Justice, Washington, D.C. (Robert L. Klarquist, Dept. of Justice; F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., J. Frederick Motz, U.S. Atty., Price O. Gielen, Asst. U.S. Atty., Baltimore, Md., on brief), for appellees.
 
 
 1
 Before WINTER, Chief Judge, CHAPMAN, Circuit Judge, and MILLER,* District Judge.
 
 
 2
 JAMES R. MILLER, Jr., District Judge.
 
 I.
 
 3
 This case involves the completion of Section I of the National Freeway in Western Maryland. The National Freeway will provide a highway link between the Ohio Valley and the Atlantic Seaboard. (J.A. Vol. II, II.1). It is intended as a part of the program authorized by Congress in 1965 through the Appalachian Regional Development Act (ARDA), 40 U.S.C. App. Sec. 1 et seq. The ARDA establishes a program, administered by the Appalachian Regional Commission, for providing and upgrading basic infrastructure needs of the Appalachian area, including transportation (Appalachian Development Highway Program), id. Sec. 201, so as to promote economic development in that area. Id. Sec. 2. Corridor E of the National Freeway extends from Morgantown, West Virginia to Hancock, Maryland. Corridor E has been completed since 1976 with the exception of two segments, designated as Sections I and II.[1] These two sections are located in Western Maryland.
 
 
 4
 Section I of the National Freeway extends from Wolfe Mill to M.V. Smith Road in Allegany County, Maryland.
 
 
 5
 Originally, Sections I and II were considered together. In 1973, a Draft Environmental Impact Statement (DEIS)/Section 4(f) Statement was prepared covering "build and no-build" alternatives for both sections (J.A. Vol. I at 158-71). On December 12 and 13, 1973, the United States Department of Transportation (USDOT), the Federal Highway Administration (FHWA), the Maryland Department of Transportation (MdDOT), and the Maryland State Highway Administration (SHA) held public hearings for discussions of the proposed alternatives. The Final Environmental Impact Statement (FEIS) for Section II was circulated in August, 1976, and a route location was approved by the Federal Highway Administration in June, 1977. Due to an apparent need for further study of affected areas, route selection for Section I was delayed. Maryland Wildlife Federation v. Lewis, 560 F.Supp. 466, 469 (D.Md.1983).
 
 
 6
 The DEIS discussed and referenced a number of route alternatives for Section I. The major lines discussed were Line A, BF2, and AGEENA.[2] Line A involved upgrading existing U.S. Route 40, widening and adjusting the road and controlling access from local traffic. (J.A. Vol. I at 162-63). Line BF2 was the most southerly route considered in any depth in the DEIS. (Id. at 163-64). Line AGEENA was called the "mid-corridor" alternative to Lines A and BF2. (Id. at 164-65). Other permutations of the routes were considered in the DEIS, but are of no relevance here. At the December, 1973 hearing, the Maryland Department of Natural Resources, through Anthony Abar, Chief of Program Planning and Evaluation for the Department, recommended that Line A in Section I be selected for the design phase. (J.A. Vol. I at 172-80). In 1974, then Secretary Harry R. Hughes of MdDOT announced that Line AGEENA, the middle alternative, would be recommended by Maryland highway officials to USDOT for design study. Line A was seen by him as displacing too many people and Line BF2 as posing too severe an impact on State forest land. (Id. at 182-182b).
 
 
 7
 Preparation of an FEIS/4(f) Statement was delayed as a result of concerns expressed by the United States Department of the Interior that the impact on historical sites had been inadequately addressed. Subsequently, the SHA, the FHWA, and the Maryland Historical Trust worked together with the United States Department of the Interior and the United States Advisory Council on Historic Preservation to identify historic sites and districts in the AGEA, AGBF2, and AGEENA corridors. (Id. at 183-86).
 
 
 8
 On January 24, 1978, after a preliminary FEIS was circulated, the agencies held a supplemental location public hearing. Meetings with various agencies subsequently occurred with particular expert viewpoints being expressed regarding the proposed routes. (J.A. Vol. I at 191-201). The FEIS/4(f) Statement for Section I was approved by the Federal Highway Administrator on August 7, 1980. That document recommended that the highway be built along alternate route AGBF2. (J.A. Vol. II). Comments on the FEIS, contained in the Appeal Transcript, were received from the Environmental Protection Agency and the United States Department of the Interior. (J.A. Vol I at 202-11).
 
 
 9
 The parties apparently agree that the Regional Administrator of FHWA, with the approval of USDOT, approved the AGBF2 location for Section I in October, 1980.
 
 II.
 
 10
 In September, 1981, the Maryland Wildlife Federation and Route 40 Advocates (hereafter referred to collectively as "MWF") filed suit against the Secretary of USDOT and other federal and state officials for declaratory, injunctive and other relief. After the district court granted summary judgment for defendants, Maryland Wildlife Federation v. Lewis, 560 F.Supp. 466 (D.Md.1983), this appeal followed.
 
 
 11
 The issues presented on appeal are: (1) Whether the Secretary of Transportation and the other defendants failed to comply with section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. Sec. 1653(f) (current version at 49 U.S.C. Sec. 303 (1983)), and section 18(a) of the Federal-Aid Highway Act, 23 U.S.C. Sec. 138, by failing (a) to determine which alternative route for Section I of the National Freeway System would minimize harm to state forests, recreational areas, and historical sites affected by construction of that segment of highway and (b) to select the route which minimizes the harm; and (2) Whether the Secretary of Transportation and the other defendants failed to comply with section 102 of the National Environmental Policy Act (NEPA), 42 U.S.C. Sec. 4332, by failing adequately to consider the no-build and the Route 40 Upgrade Alternative because of the mistaken belief that these options were precluded by the Appalachian Regional Development Act, 40 U.S.C. App. Sec. 1 et seq.
 
 III.
 
 12
 The term "4(f)" in the present context refers to section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. Sec. 1653(f). Section 4(f) has been repealed but was recodified without substantial change at 49 U.S.C. Sec. 303. Section 18 of the Federal-Aid Highway Act, 23 U.S.C. Sec. 138, is for the purposes of this appeal identical to section 4(f). These statutes will be referred to collectively herein as "Sec. 4(f)."
 
 
 13
 Section 4(f) provides clear and specific directives. The Secretary shall not approve any program or project which requires the use of "publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State or local significance" unless "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 23 U.S.C. Sec. 138; 49 U.S.C. Sec. 1653(f); 49 U.S.C. Sec. 303. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). See also Louisiana Environmental Society, Inc. v. Coleman (LES II ), 537 F.2d 79, 82 (5th Cir.1976); Monroe County Conservation Council v. Adams, 566 F.2d 419, 422 (2d Cir.1977), cert. denied, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).
 
 
 14
 In Overton Park, the Supreme Court considered the standard of judicial review applicable to a determination of whether the Secretary had acted properly in light of Sec. 4(f)'s requirements. A court must determine whether the Secretary was acting within the scope of his authority and then must determine whether the actual choice made was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Overton Park, 401 U.S. at 415-16, 91 S.Ct. at 823. In making this latter finding, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 416, 91 S.Ct. at 824. "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. Id. at 416, 91 S.Ct. at 823. The final inquiry is whether the Secretary's actions followed the necessary procedural requirements. Id. at 417, 91 S.Ct. at 824. See also Montgomery County v. United States Environmental Protection Agency, 662 F.2d 1040, 1041-42 (4th Cir.1981).
 
 IV.
 
 15
 The appellants allege that the Secretary exceeded the scope of his authority by failing to consider which route would pose the least harm to all the section 4(f) resources impacted by Section I. Recognizing that all the alternatives, except for "no-build," would require the taking of some 4(f) land, the appellants limit their appeal to the alleged failure by the Secretary to comply with 4(f)(2). (Appellants' Brief, at 28; Reply Brief at 3).
 
 
 16
 Subsection (2) of Section 4(f) is implicated when all of the alternatives which are considered would use protected land. LES II, 537 F.2d at 85. "This [Section 4(f)(2) ] requires a simple balancing process which would total the harm to the recreational area of each alternate route and select the route which does the least total harm." Id. at 85-86. See also Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 784 (9th Cir.1980). Specifically, the appellants charge that the only balancing which occurred involved the impact of the proposed construction on historical sites and that impacts on other types of protected lands (in particular, Green Ridge State Park) were ignored. (Appellants' Brief at 29-30).
 
 
 17
 Secondly, the appellants indicate that, if anything, section 4(f) was intended to emphasize protection for parklands and forests, not for historic sites. (Appellants' Brief at 30, n. 44).
 
 
 18
 Thirdly, the appellants contend that the defendants' position, accepted by the district court, MWF, 560 F.Supp. at 474-75, that the alternates impacted equally on 4(f) property and therefore the Secretary was free to choose among them, was improper.
 
 A. Balancing of Harm
 
 19
 The FEIS/4(f) Statement discussed five alternatives, AGEENA, No-Build, AGEA, U.S. Route 40 Upgrading Proposal, and AGBF2. (J.A. Vol. II at III.6-12, VI.1-32).
 
 
 20
 Alternate AGBF2, the southernmost and shortest alignment, is approximately 16.9 miles long and is located two miles south of existing Route 40. Construction of the highway segment along Line AGBF2 requires the taking of 176 acres of forest and parkland from Green Ridge State Forest, will take 81 acres from the Breakneck Road Historical District, will affect 10 historical properties and will take 2 historic sites. AGBF2 will require 24 residential relocations, 1 business relocation, and 4 farm relocations. Stream relocation equaling 400 feet will be necessary. The cost of this alternative will be 159.6 million dollars of which 18.5 million dollars would be spent for mitigation of harmful environmental impacts.
 
 
 21
 Alternate AGEA is the northernmost alignment. It would substantially follow the existing Route 40, upgrading that roadway to freeway standards.[3] This route would be 19.11 miles long and would cost approximately 101.6 million dollars to construct. This corridor would necessitate the relocation of 78 families, 11 businesses, 3 farms, and 1 non-profit organization. Land from both the Rocky Gap State Park (22 acres) and the Green Ridge State Forest (133 acres) would be taken. In addition, 10 historical sites would be taken, 32 historical properties would be affected, 23 acres from the Breakneck Road Historical District would be taken, and 12 acres from the Flintstone Historical District would be used. This route would also require the relocation of 16,350 feet of streams. This right of way also affects a potential Wildland. (Id. at III.8, 12).
 
 
 22
 Alternate AGEENA is the middle alignment. It would require the taking of 310 acres of the Breakneck Historic District, taking 2 historic sites, affecting 14 historic properties. The right of way also would require the taking of 132 acres of Green Ridge State Forest with 11,650 feet of stream relocation being required. This 18.02 mile route would cost approximately 118.4 million dollars and would require the relocation of 36 families, 4 businesses, 10 farms and 1 non-profit organization. (Id. at III.6, 8, 12).
 
 
 23
 The No-Build alternate would involve no construction except for normal maintenance to the existing road. (Id. at III.8).
 
 
 24
 The U.S. Route 40 Upgrade Proposal took two forms. The original alignment for upgrading existing U.S. Route 40 was Alternate A, very similar in location to AGEA. This alternate addressed the upgrading of existing U.S. Route 40 to a fully controlled access highway. This option was described in the DEIS but was originally dropped from further consideration due to the required displacement of 91 dwellings, 15 businesses, 3 farms and 3 non-profit organizations and the relocation of 4 miles of existing streams. In addition to these disadvantages, this proposal would have most of the adverse effects on parkland and historic sites as would the AGEA route.
 
 
 25
 The second upgrade proposal for U.S. Route 40 was advanced by a group of citizens known as the Coalition for a Fourth Alternate. Due to a detailed feasibility study conducted by the SHA (J.A. Vol. III), this proposal of a dual highway with no controlled access was eliminated from consideration. (J.A. Vol. II at III.8-9).
 
 
 26
 Our review of the record convinces us that the Secretary did indeed consider the impact of the selected route, not just on historical sites as the appellants contend, but on all types of protected property. The Secretary's 4(f) statement contained in the FEIS (J.A. Vol. II at VI) compares the effects of the build alternatives, and the Alternates portion of the FEIS compares the three alternative routes. (Id. at III). Each of these sections reviews not just the impact on historical sites, but also the impact on parkland and state forests. A comparison chart (id. at III.12) lists for each of the three alternative routes the number of acres of parkland and historical sites affected and the amount of stream relocation required. Another chart (id. at iii-vi) indicates that the effect on water quality would be severe along Line AGEA and moderate for AGBF2. These references to parts of the administrative record are not meant to indicate an agreement with the choice of AGBF2 but to demonstrate that, contrary to the appellants' contention, the Secretary did consider the effect the proposed alternatives would have on parkland as well as historical sites. While the delay in the submission of an FEIS was caused by the consideration of historical sites, and even though the Department of the Interior, after review of the FEIS, concluded that the AGBF2 would be the most disruptive environmentally, these facts do not support an assertion that the effect of the chosen route on parkland was not considered. Rather, they suggest consideration by the Secretary of all types of protected 4(f) property and the unavoidable result that, when a choice is made, some individuals or agencies may be disappointed.
 
 
 27
 Obviously, the views of the Department of the Interior should be given great weight, both by the Secretary and by this court. Nevertheless, nothing in the relevant statutes or authoritative case law gives the Department of the Interior a veto over route selection of a highway in a situation where, as here, any route selected would have some impact on 4(f) property.
 
 
 28
 B. Priority of Parkland Over Other 4(f) Property
 
 
 29
 The district court rejected, 560 F.Supp. at 474, the suggestion of appellants that the Supreme Court in Overton Park interpreted section 4(f) as affording parkland greater protection than other types of 4(f) property such as historical sites. We likewise reject that suggestion. The question of the relative importance or priority of one type of 4(f) property over another type was not an issue in Overton Park. While the Supreme Court did say in that case that parkland "as green havens" were of "paramount importance," 401 U.S. at 412-13, 91 S.Ct. at 821-822, those comments were made in the context of a comparison of 4(f) property with non-4(f) property, rather than in the context of a comparison of different types of 4(f) property with each other.
 
 
 30
 Furthermore, the Court stated that the words of the statutes themselves were the primary source of enlightenment as to the intent of Congress in enacting section 4(f). 401 U.S. at 412 n. 29, 91 S.Ct. at 821, n. 29. The statutes themselves, 49 U.S.C. Sec. 1653(f), recodified at 49 U.S.C. Sec. 303, and 23 U.S.C. Sec. 138, do not provide any basis for highlighting and preferring one type of protected property over another.
 
 
 31
 C. Secretary's Choice of Route Not Based on Finding of Equal Harm
 
 
 32
 Appellants contend that the Secretary's act of selecting Line AGBF2 was beyond the scope of her authority because there was no demonstration or finding that the alternate routes had a substantially equal impact on section 4(f) properties. If there had been such an administrative finding based upon substantial evidence, the Secretary would have been able to choose freely among the alternatives. As the Fifth Circuit stated in LES II, 537 F.2d at 86:
 
 
 33
 Therefore, if an alternate would not minimize harm it would not have to be accepted in lieu of the suggested or adopted route. The Secretary would be free to choose between equal damage alternatives.... If the Secretary's review should result in concluding that the harm is not only similar but substantially equal, the Secretary could freely choose between these suggested routes.
 
 
 34
 Id. (Emphasis in original).
 
 
 35
 This situation, in which the alternate routes would do equal damage thereby permitting the Secretary to choose freely among those routes, is one which will, we think, rarely occur. The quantitative weighing of harm to numerous and different types of valued resources is itself difficult, and the relative harm is not likely often to be capable of precise objective measurement.
 
 
 36
 In the present case, as the appellants suggest, there is no indication in the record that the Secretary found that the harm occurring along each of the proposed routes was equal and that the Secretary then made a choice among equal alternatives. The judiciary should not read into the weighing process of the Secretary a conclusion of equal harm. The focal point for judicial review is the administrative record, not post hoc rationalizations or interpretations. See Louisiana Environmental Society, Inc. v. Dole (LES III), 707 F.2d 116, 119 (5th Cir.1983).
 
 
 37
 The mere fact, however, that the Secretary did not conclude that the harm caused by the alternative routes would be equal does not necessarily mean that the Secretary's scope of authority was exceeded. If the Secretary chose the alternative which reasonably could be viewed as the one which minimized harm to the protected property, as required by Sec. 4(f)(2), then the Secretary acted within the scope of her authority. An examination of that determination is made in the next section.V.
 
 
 38
 We turn now to the merits of the specific determination made by the Secretary. The appellants contend that the choice of AGBF2 was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law in that (1) the Secretary failed to weigh all the relevant factors by failing to consider the adverse impact on Green Ridge State Forest, and (2) that the selection of AGBF2 was a clear error of judgment under section 4(f)(2) because it is the most environmentally damaging.
 
 
 39
 Under the "arbitrary and capricious" standard, the reviewing court must determine whether the selection of AGBF2 was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Overton Park, 401 U.S. at 415, 91 S.Ct. at 823. As this court has previously stated,
 
 
 40
 the court is "not [to] make the ultimate decision" but only to see "that the official or agency take a 'hard look' at all relevant factors." This is so because the power of judicial review in this area, is a narrow one to be applied within reason, and in essence is confined to a determination of whether the administrative decision "represented a clear error of judgment." In making such determination, the court is not to be led into construing the mandating statutes as a device to be used as "a crutch for chronic faultfinding".... In sum, so long as the court, in its review, observes the rule of reason and practicality and takes a "hard look" at the relevant factors, it performs its obligation under the statutes.
 
 
 41
 Coalition for Responsible Regional Development v. Coleman, 555 F.2d 398, 400 (4th Cir.1977) (citations omitted). In the same vein, the Ninth Circuit has stated:
 
 
 42
 even under the exacting Sec. 4(f) requirements, the judicial branch may not "fly speck," if it appears, in its review, that all factors and standards were considered. Whether or not the reports and studies use the "magic" terminology, there has been a reasonable and thorough review of a voluminous record accumulated over a span greater than ten years, which includes extensive public contribution.
 
 
 43
 Adler v. Lewis, 675 F.2d 1085, 1095 (9th Cir.1982). See also Louisiana Environmental Society, Inc. v. Dole, (LES III), 707 F.2d 116, 122-23 (5th Cir.1983); Monroe County, 566 F.2d at 426.
 
 
 44
 The burden of proof is on the challenging appellants to establish that the Secretary of Transportation acted improperly in approving the use of protected 4(f) property. Monroe County, 566 F.2d at 422 (and cases cited therein). See also LES III, 707 F.2d at 119.
 
 
 45
 In an attempt to meet that burden, the appellants contend that the decision to choose route AGBF2 was arbitrary and capricious, because the Secretary failed to consider its adverse impact upon Green Ridge State Forest. Our reading of the record does not support that contention. Section VI of the FEIS/4(f) Statement clearly shows that an analysis was made of the impact of the alternative routes on parkland in general and on Green Ridge State Forest in particular. (J.A. Vol. II at VI.8-12). In addition, mitigation measures for the harm to Green Ridge State Forest were considered and adopted as a part of the proposal for route AGBF2. (Id. at VI.31-32). These sections of the FEIS also indicate that the Secretary did consider, contrary to the appellants' assertion, the impact of fragmentation of a part of the Green Ridge State Forest. (J.A. Vol. II, v, V.4-5, V.9, V.25-44). In short, the Secretary's decision will not be found to be inadequate because of a failure to consider an impact on Green Ridge State Forest.
 
 
 46
 Next, the appellants contend that the selection of route AGBF2 constitutes a clear error of judgment in light of the comments made by the Department of the Interior by letter, dated October 28, 1980, and the Environmental Protection Agency (EPA) by letter of October 20, 1980.
 
 
 47
 In commenting on the FEIS, the United States Department of the Interior expressed its view, stating that AGBF2 was "the most environmentally damaging alternative, and that it will cause irreparable harm to the recreational and fish and wildlife values of the Green Ridge State Forest." The Interior Department preferred a modified AGEA route. The Department based its comments, at least in part, on its view that the AGEA route would use 200 acres less of the proposed total area of Green Ridge State Forest than would AGBF2,[4] that the use by AGEA of Rocky Gap State Park land could probably be limited, that the four miles of stream relocation of AGEA would be less adverse than the impact of the AGBF2 route on seven major high quality streams, that the AGEA route would have less adverse impact on cultural and historic sites than would AGBF2, that the relocation of families and businesses required by the AGEA route would not be so numerous as to fit within the "community disruption ... [of] extraordinary magnitudes" exception stated in Overton Park, 401 U.S. at 413, 91 S.Ct. at 822, as a possible basis for the use of 4(f) property for a highway route, and that mitigation efforts would not be to the degree proposed when the effects of inflation and delay were considered. (J.A. Vol. I at 206-11).
 
 
 48
 The EPA commented that it had several reservations about the FEIS because it felt that some topics had not been fully discussed. The EPA did not suggest a particular alternative route to AGBF2 (J.A. Vol. I at 202-05), but in 1973 it had said that Line A was the least desirable alternative from an environmental viewpoint. Adm. Record, Exh. 51 at 3.
 
 
 49
 While there is no doubt that the choice of AGBF2 is one which will have an environmental impact, this court cannot conclude that the Secretary's choice of AGBF2 is an unreasonable one. Although the Interior Department and the EPA raised several objections to the AGBF2 alternative as presented in the FEIS/4(f) Statement, those agencies did not have a veto over the route to be selected by the Secretary and their comments did not necessarily eliminate the power of the Secretary to give greater weight to other information and views in the administrative record. 23 U.S.C. Sec. 138; 49 U.S.C. Sec. 303(b) (1983) (formerly codified at 49 U.S.C. Sec. 1653(f)) (stating that the Secretary of DOT "shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States" (emphasis added), but making it clear that any determination and subsequent approval is to be made by the Secretary). 49 U.S.C. Sec. 303(c). See also 23 CFR Sec. 790.7(a)(2).
 
 
 50
 The October 28, 1980 comments by the Department of the Interior were not made within the thirty-day review period allowed by the Council on Environmental Quality's regulations (40 CFR Sec. 1506.9).[5] The State and Federal highway officials responded to these comments, as far as the record before the court shows, through a notation by a USDOT official, that no action on Interior's comments was then necessary and that Interior would have a representative on the final design team and through a letter to Interior in early 1981. (Admin.Rec., Exh. 240). The factual underpinnings of Interior's opinions expressed in its October 28, 1980 letter were the subject of several sections of the FEIS/4(f) Statement.
 
 
 51
 The United States Advisory Council on Historic Preservation concluded that route AGBF2 was preferable over the AGEA and the AGEENA alternatives. (J.A. Vol. II at X.G-5). An earlier letter from the Department of the Interior also indicated that AGBF2 was the preferable route in terms of historical preservation. (J.A. Vol. II at X.G-14). The Memorandum of Agreement reached between the Maryland State Highway Administration and the Maryland Department of Natural Resources included extensive mitigation plans including the construction of structures to provide continuity of existing trails for hikers, wildlife, timber management and fire control to minimize the effect of fragmentation of Green Ridge State Forest. (J.A. Vol. II at X.B). The Advisory Council on Historic Preservation also entered into a Memorandum of Agreement to minimize AGBF2's impact on 4(f) historic property. (J.A. Vol. II at XA). The FEIS also noted that the AGEA route would have required acreage from two historic districts, the Flintstone district and the Breakneck Valley Historic District. (J.A. Vol. II at VI.20). The number of historic sites affected by the AGEA and AGBF2 routes is also incorrectly compared by Interior in the 1980 letter. The letter erroneously states that AGEA affects 10 sites and AGBF2 impacts six when in fact AGEA takes 10 sites and adversely affects 32 others while AGBF2 takes two sites and affects 10 others.
 
 
 52
 In contrast to the viewpoint expressed by the Department of the Interior, the Maryland Department of Natural Resources and MdDOT concluded that the decision to follow AGBF2 was a decision based upon the joint determination that AGBF2 represented the most appropriate, feasible and acceptable of alignments considered from the viewpoint of service, engineering, and impact on the forest, and the proposed Wildland area at Polish Mountain. (J.A. Vol. II at X.b-2). The AGEA line would have impacted a part of the Green Ridge State Forest at Polish Mountain which is potential Wildland area. (Id. at VI.8-10).
 
 
 53
 Appellants argue that the "minimization" prong of section 4(f) cannot be met, even in part, by generalized agreements to mitigate specific adverse environmental impacts of a particular route in the absence of a detailed design plan, citing D.C. Federation of Civic Associations v. Volpe, 459 F.2d 1231, 1239 (D.C.Cir.1972), in support of that proposition. It is true that the District of Columbia Circuit said in that case, involving section 4(f) property, that "[a]bsent a finalized plan for the bridge, it is hard to see how the Department could make a meaningful evaluation of 'harm,' " id., in satisfaction of the requirements of the second prong of section 4(f). That statement by the panel majority was later modified, however, in denying rehearing, when it said:
 
 
 54
 It is equally well to note, as the Government points out, that in such a project the Secretary must be permitted to make decisions in what might be called a progressive manner--not everything can be pulled together all at once. But when decisions necessary to final approval are made, such as those required with respect to parklands by Section 138 of Title 23, they must be made conditionally and tentatively, subject to readjustment and reconsideration as the process toward final determination goes forward. And final approval must await and be dependent upon completion of this process.
 
 
 55
 Id. at 1268.
 
 
 56
 It is totally unrealistic, as well as in violation of the Federal-Aid Highway Act, to require final design of a proposed highway before the corridor location of that highway is resolved. The statutory and regulatory scheme contemplates that location approval of a proposed federal-aid highway take place first, 23 U.S.C. Sec. 103(d) and (f); 23 CFR Sec. 790.9(e)(2)(i) (1983).[6] Before location approval may be given by the Secretary, a public hearing on the proposed location must be held, 23 U.S.C. Sec. 128; 23 CFR Sec. 790.9(e)(1)(ii). Then design approval, 23 CFR Sec. 790.3(d), must be obtained from the Secretary after a design public hearing has taken place, 23 CFR Sec. 790.9(e)(2)(iii). Only after plans, specifications and estimates (P.S. & E) approval has been given is the federal government contractually obligated to fund its share of the proposed project. 23 U.S.C. Sec. 106(a); Lathan v. Brinegar, 506 F.2d 677, 686 (9th Cir.1974). FHWA has an obligation "to implement those mitigation measures stated as commitments in the environmental documents prepared" which it will fulfill "through reviews and approvals of designs, plans, specifications and estimates (P.S. & E) and construction inspections." 23 CFR Sec. 771.109(b). While the FHWA and the state highway officials are obliged to complete "any necessary design work[,] required to make those engineering and environmental decisions necessary to complete ... an EIS," 23 CFR Sec. 771.113(a), other design work cannot proceed until an FEIS has been approved and a location decision made. Id. (Emphasis supplied).
 
 
 57
 Some preliminary design work was obviously done to determine environmental impacts (J.A. Vol. II at III; IV; V; VI), and, as contemplated by the regulations, 23 CFR Sec. 771.109(b), a mitigation plan has been adopted to minimize the potential harmful effects of the AGBF2 route. (Id. at X.A-1-10; X.B-2-7). On this record, this court cannot say as a matter of law that insufficient design work took place to allow the Secretary to make a location decision which, in all events, is conditional and tentative until final P.S. & E approval has taken place, D.C. Federation of Civic Associations, 459 F.2d at 1268; 23 U.S.C. Sec. 106(a). To the extent, if at all, D.C. Federation of Civic Associations is to the contrary, we decline to follow it.
 
 
 58
 In addition, we do not agree with the apparent position of the appellants that the minimization of harm requirement of section 4(f)(2) can only be met by a change in route location. The minimization requirement encompasses all measures which would minimize harm. Adler v. Lewis, 675 F.2d at 1095.
 
 
 59
 After reviewing all of the specifics mentioned above and the record presented to this court as a whole, we cannot conclude that the determination to choose AGBF2 as the least harmful route was an unreasonable one. There is a basis in the record for a reasonable belief that no feasible and prudent alternatives exist to the AGBF2 route and that all possible planning to minimize harm has been or will be undertaken. That is all that is required for us to conclude that the Secretary made no "clear error of judgment" nor failed to consider the relevant factors.
 
 VI.
 
 60
 The appellants have asserted here that the Secretary's selection of AGBF2 is contrary to the requirements of sections 102(2)(B) and 102(2)(C) of NEPA.
 
 A. NEPA--Section 102(2)(B)
 
 61
 Section 102(2)(B), codified at 42 U.S.C. Sec. 4332(2)(B), requires all agencies of the Federal Government to "identify and develop methods and procedures ... [to] insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." It is not clear that appellants made any argument in the district court based on section 102(2)(B), but it is clear that in this court appellants have not indicated in their briefs how the federal defendants have failed to identify and develop such procedures. The court finds no merit in the contention.
 
 B. NEPA--Section 102(2)(C)
 
 62
 Section 102(2)(C), codified at 42 U.S.C. Sec. 4332(2)(C), calls for the preparation of a detailed environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." The statement must appraise, among other things, any adverse environmental effects of the proposed action, available alternatives, and any irreversible commitment of resources which would result.
 
 
 63
 NEPA, "while establishing 'significant substantive goals for the Nation,' imposes upon agencies duties that are 'essentially procedural.' " Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 499-500, 62 L.Ed.2d 433 (1980). See also Adler, 675 F.2d at 1096 (and cases cited therein). The overriding objective is to assure that environmental considerations and alternatives are seriously "canvassed and assayed" before a project is launched. City of Boston v. Volpe, 464 F.2d 254, 257 (1st Cir.1972). See Westside Property Owners v. Schlesinger, 597 F.2d 1214, 1217 (9th Cir.1979). But, "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 [96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576] (1976)." Strycker's Bay, 444 U.S. at 227-28, 100 S.Ct. at 500. Thus, like review of the Secretary's 4(f) determination, judicial review of administrative determinations under NEPA is a limited one. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); Coleman, 555 F.2d at 400. The Secretary's decision must be upheld unless it is determined that she failed to follow prescribed procedures or the decision made was arbitrary and capricious, and an abuse of discretion. Township of Springfield v. Lewis, 702 F.2d 426, 442 (3d Cir.1983).
 
 
 64
 As previously stated, the purpose of NEPA is to require the consideration of reasonable alternatives and to assure that these alternatives are not unreasonably constricted. Green County Planning Board v. Federal Power Commission, 559 F.2d 1227, 1232 (2d Cir.1976), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); Fayetteville Area Chamber of Commerce v. Volpe, 515 F.2d 1021, 1027 (4th Cir.), cert. denied sub nom. Interstate 95 Committee v. Coleman, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140 (1975). A detailed statement of alternatives will not "be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." Vermont Yankee, 435 U.S. at 551, 98 S.Ct. at 1215. See also Coleman, 555 F.2d at 400; Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir.1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); Natural Resources Defense Council v. Morton, 458 F.2d 827, 837-38 (D.C.Cir.1972). The alternatives discussion is held to be subject to a requirement of reasonableness. Adler, 675 F.2d at 1097 (and cases cited therein). See Township of Springfield, 702 F.2d at 442 n. 29.
 
 
 65
 The appellants contend that both the Secretary and the district court dismissed the no-build and the Route 40 Upgrade alternatives for an erroneous reason and without a proper consideration of factors relevant to its feasibility. They assert that these less than freeway alternatives were rejected solely because of a mistaken belief that ARDA requires that an ARDA road must be a freeway.
 
 
 66
 In our view, neither the administrative record nor the district judge's careful opinion support this contention.
 
 
 67
 The alternatives analyzed in the FEIS included AGBF2 and three variations thereof; AGEA, a route generally following existing Route 40 and upgrading it to freeway standards; AGEENA; no-build; and the Fourth Alternate, upgrading Route 40 to a dual highway of less than freeway standards with partially controlled access. (J.A. Vol. II at II.6, III.1-12, Figure 3). The Secretary undertook a detailed study, referenced in the FEIS,[7] analyzing the Fourth Alternate. (J.A. Vol. II at III.8-9); J.A. Vol. III). The no-build alternative is fully considered in the FEIS also. (J.A. Vol. II at II.6-8, III.8-9).
 
 
 68
 The engineering studies indicated that, considering the interstate nature of the traffic for which the National Freeway is intended, the present and anticipated traffic volume, and the mountainous terrain which Section I traverses, uncontrolled access, insufficient median width, inadequate right of way width to allow safety grading, and substandard curvatures and grades for safe design speeds, among other engineering problems, made the no-build and the Fourth Alternate unsafe alternatives. Safety of the motoring public is, under any reasonable formulation of considerations to be used in deciding among highway alternatives, a relevant, if not one of the most important, factors.
 
 
 69
 That the "less than freeway" alternatives were not rejected out of hand on the assumption that ARDA required a freeway is demonstrated most forcefully by the fact that the Fourth Alternate was carefully studied. If the responsible highway officials had felt that a less than freeway alternative was automatically excluded under ARDA, there would have been no point in conducting the study of the Fourth Alternate.
 
 
 70
 What the record discloses, as we read it, and what the district court found, as we interpret his opinion, is that the no-build and Fourth Alternate were rejected, not because any non-freeway would be incompatible with ARDA, but because in the circumstances disclosed in the FEIS those alternatives would not be consistent with the purpose of ARDA to provide safe transportation access to Appalachian Region and that, therefore, they were not feasible or prudent.
 
 
 71
 We concur with the district court that the Secretary's rejection of the no-build and the Fourth Alternate was a reasonable one. See D.C. Federation of Civic Associations v. Adams, 571 F.2d 1310, 1313 (4th Cir.1978); Coleman, 555 F.2d 398; Fayetteville Area, 515 F.2d 1021.
 
 VII.
 
 72
 The dissent points out that the appellees' brief conceded that "[m]inimization of relocation disruption was a factor that contributed to the Secretary's decision" and reasons from that statement that an improper factor thus was utilized by the Secretary in deciding upon the route of the highway. In the circumstances of this case, we respectfully disagree.
 
 
 73
 The seminal authority on the proper interpretation of Sec. 4(f) is Overton Park. That case did not involve a situation, such as this, in which all of the alternatives, except for "no-build," would require the taking of some 4(f) land. Therefore, the discussion in Overton Park, 401 U.S. at 411-13, 91 S.Ct. at 821-822, referred to in the dissent, concerning the meaning of Sec. 4(f)(1) relating to the absence of a "feasible and prudent alternative to the use of such land" loses force when considered in the context of a case where, as here, there is "no feasible and prudent alternative to the use of" some Sec. 4(f) land. In this context, as previously noted, supra at pages 8 and 9, the focus of the inquiry must be on the requirements of Sec. 4(f)(2), rather than those of Sec. 4(f)(1).
 
 
 74
 As we point out supra on pages 236-240, the Secretary did determine, not that the harm to the Sec. 4(f) property caused by each alternative was equal, but that the harm caused by the chosen route was the least damaging of all the alternatives. Once that determination was reasonably made, the Secretary's incidental consideration that the chosen route also caused less community disruption than the other alternative "build" routes was not a violation of the strict mandate of Sec. 4(f), but merely a recognition of another factor which Congress intended to be considered, Overton Park, 401 U.S. at 412, 91 S.Ct. at 821, but not at the expense of choosing a more environmentally damaging alternative.
 
 
 75
 We do not view the holding in LES II as in conflict with this conclusion. In that case, contrary to the finding here, the court pointed out that the Secretary there had not balanced the harm to different parts of the recreational area there involved which would be caused by the various alternative routes as was required by Sec. 4(f)(2), 537 F.2d at 86. To the extent, if at all, LES II is in conflict with our conclusion, we disagree with it.
 
 
 76
 AFFIRMED.
 
 
 77
 HARRISON L. WINTER, Chief Judge, dissenting in part and concurring in part:
 
 
 78
 I agree with the majority, for the reasons assigned by it, that nothing in the Secretary's selection of the route location AGBF2 runs contrary to the requirements of NEPA, but I think that the Secretary's selection is legally deficient in two other respects. First, I think that the Secretary improperly gave weight to such factors as residential and business disruption when they were neither "unusual" nor "extraordinary" so as to warrant their consideration. Thus, I think that the majority implicitly, if not explicitly, approves a construction of Sec. 4(f)[1] which is in conflict with controlling authority. Second, I think that, even under her construction of Sec. 4(f), the Secretary has failed to give proper weight to the evidence of environmental damage which the route selected will inflict, so that her decision is arbitrary and capricious.
 
 
 79
 Although I concur in part, I also respectfully dissent in part.
 
 I.
 
 80
 Section 4(f) expresses the national policy to protect parklands and other specified national resources and prescribes the conditions under which the Secretary of Transportation may permit their desecration. It reads in pertinent part:
 
 
 81
 (a) It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.
 
 
 82
 (c) The Secretary may approve a transportation program or project requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if--
 
 
 83
 (1) there is no prudent and feasible alternative to using that land; and
 
 
 84
 (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.
 
 
 85
 The Supreme Court has expressly delineated the considerations the Secretary may take into account in determining where highways should be placed and has held that Sec. 4(f) severely restricts the weight that may be given to some of those factors. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). That case involved a proposal to construct an interstate highway through a park in Memphis, Tennessee, which would have destroyed 26 acres of a 342-acre park and would have severed the parkland not destroyed. In holding that the Secretary had improvidently approved the proposal, the Court began its analysis with the proposition that in almost every case considerations such as cost, directness of route, and community disruption will militate toward selecting parkland for highway construction. Id. at 411, 91 S.Ct. at 821. The majority explained:
 
 
 86
 ... since people do not live or work in parks, if a highway is built on parkland no one will have to leave his home or business. Such factors are common to substantially all highway construction. Thus, if Congress intended these factors to be on an equal footing with preservation of parkland, there would be no need for the statutes. Congress clearly did not intend that the cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that the alternative routes present unique problems.
 
 
 87
 Id. at 412-413, 91 S.Ct. at 821 (emphasis supplied).
 
 
 88
 In the case at bar, the Secretary candidly concedes that "[m]inimization of relocation disruption was a factor that contributed to the Secretary's decision." (Appellees' Brief at 27). Not surprisingly, the chosen route through the Green Ridge State Forest entails substantially fewer dislocations than any of the alternatives that track existing Route 40.[2] However, even the most disruptive of these alternatives cannot be characterized as imposing disruption of "extraordinary magnitudes" or presenting "unique problems". Indeed, community disruptions many times the size of those involved with the most disruptive of the alternatives paralleling Route 40 have been found not to be of extraordinary magnitude in similar projects.[3] I am thus persuaded that there were no "unique" or "extraordinary" circumstances that would justify giving any weight to considerations of community disruption. As the Secretary admits that these factors contributed to the choice of line AGBF2, that selection was improperly grounded and therefore exceeded the scope of the Secretary's authority.
 
 
 89
 The majority painstakingly catalogues the evidence concerning effects of each of the alternatives on properties protected by Sec. 4(f). Effects on environmental resources as well as on historical properties are considered in detail and, properly, no mention is made of possible community disruption in the review of the Secretary's decisionmaking process. On the basis of its thorough review of all relevant factors, the majority "cannot conclude that the determination to choose AGBF2 as the least harmful route was an unreasonable one." Were I convinced that the Secretary scrupulously limited her assessments to the same factors as the majority, and were I persuaded that the Secretary properly interpreted and weighed the evidence of environmental damage, see part II infra, I might agree. In light of her admission to the contrary, however, I cannot agree that the decision was a reasonable one. Because the Secretary admits that factors of community disruption "contributed" to the decision, I must conclude that the choice of route could have been based on an entirely improper consideration. It is impossible to say precisely how much weight concerns about disruption were accorded, but the Supreme Court has unequivocally expressed the view that parkland cannot be used for those reasons unless the disruption is "extraordinary" and here it clearly is not.
 
 
 90
 The Secretary should have based her selection, as the majority appears to have based its review, entirely on an analysis of Sec. 4(f) factors. "The reasoning process must be kept entirely separate." LES II, supra, at 86. Once it is decided that community disruption is not extraordinary, those considerations are no longer properly a part of the decisionmaking process. There is no question that cost and disruption should not be ignored. Overton Park, 401 U.S. at 412, 91 S.Ct. at 821. However, when the disruption is not "extraordinary", those considerations should not simply be thrown into the balance on an equal basis with environmental concerns. To hold otherwise would squarely contravene the logic of Overton Park that if "Congress had intended these factors to be on an equal footing with preservation of parkland, there would have been no need for the statutes." Id.
 
 
 91
 The only argument that could legally justify the Secretary's consideration of community disruption is correctly refuted by the majority opinion. The Secretary would have been able to choose freely among the alternatives on any basis if there was a finding that the alternative routes had substantially equal impact on Sec. 4(f) properties. LES II, 537 F.2d at 86. In this case, the majority correctly concludes that "there is no indication in the record that the Secretary found that the harm occurring along each of the proposed routes was equal and that the Secretary then made a choice among equal alternatives." I agree and conclude, in the absence of the ability to choose freely among the alternatives as well as the absence of "extraordinary" disruption, the Secretary was confined to considering only the relative impacts on Sec. 4(f) properties. As she admits this was not done, I would reverse the judgment below and direct the Secretary to reconsider the alternatives absent improper considerations of community disruption.
 
 II.
 
 92
 While I agree with the majority that the record does not establish that the alternatives had substantially equal impact on Sec. 4(f) properties, I disagree with their conclusion that the choice was reasonable nonetheless. Rather, I believe the record persuasively establishes that the most environmentally damaging alternative was chosen.
 
 
 93
 Both the Department of the Interior and the Environmental Protection Agency independently expressed serious reservations about the choice of Line AGBF2. In particular, use of line AGBF2 creates an 8000-acre pocket in the northern half of the Green Ridge State Forest, bracketed by four-lane highways; Rt. 40 to the north and AGBF2 to the south. The experts are uniform in their conclusion that this land will be substantially reduced in value as a wildlife habitat and recreation area. While the Secretary claims to have taken this into account, one searches in vain for any countervailing environmental concern that even approaches the seriousness of this problem and thereby justifies the Secretary's decision. The consequences of surrounding 8000 acres of what is now an important wildlife habitat and unspoiled wilderness with four-lane highways is simply not measurable through the Secretary's numerical comparisons of acreage taken, footage of streams relocated,[4] and historical properties affected. It is obvious to me, as well as being the unequivocal conclusion of the Department of Interior, that an alternative tracking an existing highway would be less disruptive of parkland resources than one cutting through virgin wilderness. I can only conclude that, in addition to basing her choice on improper considerations of particularly unextraordinary community disruption, the Secretary simply made an error in judging the environmental consequences of each route. In either case, reconsideration is appropriate.
 
 
 94
 In Overton Park, the Supreme Court attached "paramount importance" to the protection of "parkland". 401 U.S. at 412-413, 91 S.Ct. at 822. The majority is technically correct that this precedent cannot be taken beyond question to establish the supremacy of "parkland" over other properties also protected by Sec. 4(f) such as those of historical significance.[5] Nevertheless, by any measure adopted by any observer, the chosen route has a substantially greater adverse impact on one of the "few green havens" we have remaining than any other alternative route. Because of this, I would conclude that the Secretary acted arbitrarily and capriciously in approving this route.
 
 
 95
 Accordingly, I think that reversal and remand are also required because the Secretary failed to give proper weight to the evidence of environmental damage to Sec. 4(f) property.
 
 
 
 *
 Honorable James R. Miller, Jr., United States District Judge for the District of Maryland, sitting by designation
 
 
 [1]
 Section I is separated from Section II by a 4.8 mile section of existing highway which has already been reconstructed to freeway standards. A route for Section II was approved by the Federal Highway Administration in June, 1977 and construction began on Section II in 1981. (Appellees' Brief, at 3 n. 4)
 
 
 [2]
 For all practical purposes in connection with this appeal, Line A is the same as Line AGEA in the FEIS for Section I, and Line BF2 is the same as Line AGBF2
 
 
 [3]
 A freeway is a highway with four or more lanes and has the following characteristics: (1) a median divider separating opposing traffic lanes; (2) vertical curves long enough to provide long sight distances; (3) shoulders wide enough to permit vehicles to stop or park out of traffic lanes; and (4) fully-controlled access
 
 
 [4]
 Actually, AGEA would use only 43 acres less of existing land in the Green Ridge State Forest and only 73 acres less of yet to be acquired land for a total of only 116 acres less (J.A. Vol. II at VI. 9)
 
 
 [5]
 Notice of the availability of the FEIS/4(f) Statement was published at 45 Fed.Reg. 62538 (September 19, 1980)
 
 
 [6]
 These regulations, Part 790 of Title 23, became effective May 9, 1973 prior to the review of the Section I highway project which began in December of 1973. 38 Fed.Reg. 12103-07 (1973). These regulations codify policies and procedures previously contained in Federal Highway Administration Policy and Procedures Memorandum 20-8 and Instructional Memorandums IM 20-3-72 and 20-4-72. Although cited to the current version of CFR for ease of reference, the sections cited are identical to those effective in 1973
 
 
 [7]
 A judicial review is not limited to the EIS but may encompass, at least, those items referenced by the EIS. See D.C. Federation of Civic Ass'n v. Volpe, 459 F.2d 1231 (D.C.Cir.), cert. denied, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972)
 
 
 [1]
 As in the majority opinion, "Sec. 4(f) means both Sec. 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. Sec. 303, and Sec. 18 of the Federal-Aid Highway Act, 23 U.S.C. Sec. 138."
 
 
 [2]
 The designated route, line AGBF2, will require 24 residential relocations, 1 business relocation and 4 farm relocations. Line AGEA, the northernmost alternative which substantially follows Route 40, would involve the relocation of 78 families, 11 businesses, 3 farms, and 1 non-profit organization. The Route 40 upgrade proposal known as "Alternate A" provided for redesigning the existing road to a fully controlled-access highway. This option was actually dropped from further consideration due to the required displacement of 91 dwellings, 15 businesses, 3 farms and 3 non-profit organizations
 
 
 [3]
 In Louisiana Environmental Society, Inc. v. Coleman, 537 F.2d 79 (5 Cir.1976), (LES II), the court dealt with two alternatives, both of which appear to have demonstrably greater disruptive effects than the alternatives at issue here. The first required displacing 120 single dwellings, 100 single apartment units (1 apartment project), 900 persons, 7 businesses, 1 church, and 1 lodge. The second required displacing 377 single families, 1,508 persons, 21 businesses, and 2 churches. Id. at 87 n. 6. The court concluded that those disruptions "cannot be found to be of an extraordinary magnitude". Id. at 87. The project at issue in that case was of similar size to the one here at issue. The controversy in LES II, involved "a 17.6-mile segment of four-lane limited access interstate roadway". Louisiana Environmental Society, Inc. v. Coleman, 524 F.2d 930, 931 (5 Cir.1975) (LES I ). The various alternatives in this case are of comparable lengths. Line AGEA would be 19.11 miles long. Line AGBF2 would be 16.9 miles long. I am, accordingly, persuaded that the community disruptions involved in this decision were nowhere approaching the "extraordinary magnitudes" sufficient to justify according any weight to those considerations. As the majority notes, the Interior Department also agreed that the disruptions involved in the alternatives were not extraordinary. Furthermore, neither the Secretary nor the majority actually contends that the disruptions are of extraordinary magnitudes. The Secretary suggests that including these considerations was appropriate even absent extraordinary circumstances. Believing that this idea squarely contravenes Overton Park, I reject the Secretary's position
 
 
 [4]
 The Secretary has attempted to justify selecting AGBF2 as the environmentally preferable alternative by pointing out that fewer total feet of streams would have to be relocated under that route than with line AGEA. In so arguing, the Secretary ignores comments by the Department of Interior and the Maryland Department of Natural Resources that relocations along AGEA would be beneficial whereas relocations along AGBF2, though fewer, would be adverse
 
 
 [5]
 The majority correctly notes that in Overton Park the language attaching "paramount importance" to "green havens" was used in the context of a comparison of 4(f) property with non-4(f) property. Arguably, this case presents a different situation as each of the alternatives adversely effect property protected by Sec. 4(f) in different ways. One choice appears to present a greater threat to parkland resources while another threatens historical properties. When taken literally, however, the Supreme Court has categorically attached overwhelming importance to preserving the nation's few green havens. While one may speculate, as the majority does, that the same importance should be attached to the preservation of historical properties, it is abundantly clear that possible community disruption should never be accorded similar weight. Thus, while I am inclined to believe that parklands have been accorded special protection by the Supreme Court, it is unnecessary to reach that question in this case because of the Secretary's admitted consideration of unextraordinary community disruption